THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOSEPH NISONOFF and MAX J. WEINSTEIN, Appellants.

First Department, January 28, 1944.

*Harry G. Anderson* of counsel (*Joseph H. Stein* with him on the brief), for appellant Joseph Nisonoff.

*Louis Susman* of counsel (*Louis Susman* and *Hyman Roffe*, attorneys), for appellant Max J. Weinstein.

*George Tilzer* of counsel (*Herman J. Fliederblum*, *Francis X. O'Brien* and *Harry E. O'Donnell* with him on the brief; *Samuel J. Foley, District Attorney, Bronx County*), for respondent.

CALLAHAN, J.   Appellants, who were licensed physicians, have been convicted of manslaughter in the first degree. The crime charged was that they performed an illegal abortion upon one Madylon McGeehan resulting in peritonitis from which she died. A review of the record satisfies us that the guilt of the defendants was established by the overwhelming weight of the evidence. The principal assignment of error upon this appeal is that these defendants were prejudiced at the trial by the receipt of incompetent evidence.

It is our view that even if the evidence complained of was improperly received the substantial rights of the defendants were not affected thereby, and thus we are required to give

judgment of affirmance. (Code Crim. Pro. § 542.) We find that the evidence in controversy was largely cumulative, that the essential matters sought to be established thereby were amply proved by other testimony, and that the evidence complained of related largely to the cause of death which was not substantially disputed. We would be content to rest with this statement of our conclusions, but we deem that the novelty of the question of law raised justifies a more extended discussion of the case.

It was established upon the trial by direct proof that Madylon McGeehan died on November 18, 1942, at a hospital in Bronx County. It was conceded that the deceased had been admitted to this hospital at the instance of defendant Nisonoff, who had been consulted by her as a physician as early as November 10, 1942. It was further conceded that decedent had originally consulted defendant Weinstein as a physician and that he had referred her to Nisonoff.

On admission of Miss McGeehan to the hospital as his patient, Dr. Nisonoff signed a diagnosis showing that she was suffering from " incomplete abortion, probably peritonitis." Dr. Nisonoff made a like statement in a letter he sent to the Board of Health of the City of New York on November 16, 1942.

On November 18, 1942, and shortly after the death of the deceased, Dr. Nisonoff signed a death certificate reading as follows:

" I hereby certify that I attended the deceased from November 15, 1942, to November 18, 1942, and last saw her alive at 6 A. M. on November 18, 1942.

" Statement of cause of death is based upon — principal cause of death: general peritonitis. Date of onset: November 16th; contributory cause of death: incomplete abortion  *  *  *."

These documents, concededly executed by defendant Nisonoff, established that deceased had experienced an abortion and that she had died from general peritonitis following the abortion.

The contention of the defendants upon the trial was, in substance, that the deceased was suffering from an incomplete and inevitable abortion on November 13, 1942, and that they had treated her only in an effort to save her life. That this defense was false was amply established by testimony other than the testimony of which appellants now complain. Consciousness of guilt was established by proof of the conceded falsity of the statements first made by the defendants when they were questioned by the authorities concerning the girl's death and by

proof that in their reports of the illness, treatment and death of deceased, they had made further false statements and had concealed material and incriminating facts.

The alleged error complained of consisted of the admission in evidence of a written report of the findings of an assistant medical examiner, one Dr. Louis L. Lefkowitz, who had performed an autopsy on the body of the deceased. Dr. Lefkowitz died before the trial. His report (other than his opinion as to the cause of death), which had been filed in the office of the Chief Medical Examiner of the City of New York pursuant to statute, was received in evidence over defendants' objection and exception.

Upon the facts disclosed in this report, another physician, Dr. Thomas A. Gonzales, Chief Medical Examiner of the City of New York, called as a witness for the People, was permitted to express an opinion that deceased had died of general peritonitis as the result of an incomplete abortion.

We find that the opinion rendered on the basis of the facts in the challenged autopsy report did little more than substantiate other proof, including statements of the defendants themselves, as to the cause of death. Defendants contend, however, that the autopsy report was hearsay; that its receipt was violative of their constitutional rights to be confronted by and to cross-examine the witnesses against them, and that this was prejudicial error requiring reversal of the judgment of conviction.

In order to review in its proper light the question thus raised, we deem it necessary to further detail the evidence in the case.

One Henry Elters, a resident of Hazleton, Pennsylvania, and concededly an accomplice in the crime charged, testified that he had arranged with defendant Weinstein, on or about October 15, 1942, to examine physically Madylon McGeehan. Miss McGeehan was then a resident of Washington, D. C., and came to New York a week later for the examination. Dr. Weinstein pronounced her pregnant. An abortion was then discussed over the telephone by Elters and Weinstein. The latter recommended a physician who was visited by the parties but who refused to participate in the case. Defendant Weinstein then arranged for a visit to defendant Nisonoff. After one futile attempt to contact the latter at his New York County office, Nisonoff was finally visited by deceased and Elters on November 10th at an office he maintained in Queens County. After examination, Dr. Nisonoff stated that Madylon McGeehan was pregnant. He testified that on this visit he found her con-

dition such that he advised her that she could complete a normal pregnancy.

Witnesses for the People stated that deceased expressed reluctance to have an abortion performed on this occasion. However, several days later, and on November 13, 1942, she returned to the Queens office of Dr. Nisonoff with Elters and Weinstein, after Weinstein had arranged for the visit.

Dr. Nisonoff testified that on an examination made on this day he found a marked change in her condition since the visit of the 10th and that a condition of inevitable abortion had developed.

There was contrary testimony given on the trial by one Camille Ewald, Dr. Nisonoff's nurse, also an accomplice, who testified for the People. She related circumstances in connection with the preparation of the deceased for the operation performed on the 13th which tended to show that deceased was in a normal state of pregnancy on that date.

Testimony was also given by a physician practicing in Washington, D. C., to the effect that he had examined deceased on October 23, 1942, and had found her pregnant and her condition good. As against this, there was some evidence that deceased had related to Elters, between October 15th and October 23rd, that she had suffered some bleeding; and there was further evidence that she had been nauseated on the way over to Dr. Nisonoff's office on November 13th.

The conflicts in the testimony thus outlined raised the principal issue in the case, to wit: whether deceased was suffering from an incomplete and inevitable abortion just prior to the operation performed on November 13, 1942, or whether her condition of pregnancy was then normal.

Concededly, on November 13, 1942, a fee of $600 was arranged and paid over to defendants, and an operation was commenced by Dr. Nisonoff on that date. The details of what occurred were testified to by Miss Ewald, as well as by the defendants. She stated that in the course of the operation there was a sudden spurting of blood which struck the doctor's glasses; that he expressed concern over what had happened and thereupon stopped the operation. The doctor requested Miss Ewald to take the patient to her (Miss Ewald's) apartment nearby. The patient remained there until November 15th, when Dr. Nisonoff caused her to be removed to the hospital in the Bronx where she later died. During the time that the patient was at the nurse's home, Dr. Nisonoff visited her several times. On one occasion he prepared a prescription for certain medicine

for her, but instead of inserting the patient's name, he inserted the name of the nurse, Ewald, and used the nurse's age, thus evidencing an intention to conceal the treatment undertaken.

We have already noted that Dr. Nisonoff prepared a diagnosis report on November 15th and issued a letter to the Board of Health on November 16th. In neither of these documents did he state anything concerning earlier treatment by him. In the letter of the 16th, he stated that his patient had denied any criminal interference with her pregnancy, although his testimony indicated that he had found interference.

It will also be noted that in the death certificate Dr. Nisonoff stated that he had only been in attendance on the patient from November 15, 1942, thus concealing what had occurred as to the examination and operation by him prior to the 15th. In addition, there was considerable testimony showing that both Weinstein and Nisonoff had requested Elters and Ewald, if questioned by the authorities, to omit any mention of defendants' connection with the case prior to November 15th.

The defendants, when questioned by the authorities, had both stated that their connection with the case had commenced on the 15th and had further stated that the patient had been taken from Dr. Weinstein's office in The Bronx to the hospital in a taxicab, whereas in fact she had come from Miss Ewald's home in Queens in an ambulance.

Defendants admitted on the trial that these statements to the authorities were false. Their only excuse for making false statements was, in effect, that they had done so at the suggestion of the nurse, Ewald, and to save her from embarrassment in some investigation to which she was being subjected.

While the testimony of defendants contradicted the story of the People's witnesses, the verdict of the jury upheld the People's contention of the issues.

The defendants claim that the verdict was against the weight of the evidence. We find that this claim is without merit, and that ample evidence existed to support the jury's verdict that Madylon McGeehan's death had resulted from criminal acts committed by the defendants.

Defendants claim that there was no sufficient corroboration of the testimony of the accomplices, Elters and Ewald. This contention we find equally untenable. We find sufficient proof, other than that given by the two accomplices, tending to connect the defendants with the commission of the crime.

There remains only the claim of prejudice based on the receipt of the autopsy report. The legal question as to whether

such evidence was competent is not free from doubt and is, in some respects, a novel one.

Prior to the year 1938, the right of a defendant to be confronted by the witnesses against him was entirely statutory in this State. (Code Crim. Pro. § 8; Civil Rights Law, § 12.) In 1938 our State Constitution was revised. A Bill of Rights was inserted therein, including a provision (art. 1, § 6) that a defendant shall be confronted by the witnesses against him. This meant that the Legislature might not thereafter diminish the right of confrontation. The extent of the protection afforded, however, must be interpreted in the light of the law as it existed at the time of the adoption of the new constitutional provision. Exceptions to the rule of confrontation recognized before the adoption of such constitutional provision and not interfering with the spirit thereof must be deemed to subsist. (*Mattox* v. *United States,* 156 U. S. 237.) Our problem, therefore, is to determine whether under our common law, or under statutes in effect in 1938, there was an exception to the rule of confrontation which would have authorized the receipt in evidence of the autopsy report.

In this State, long prior to 1938, there was a well-settled exception to the rule of confrontation to the effect that such rule did not preclude the receipt of certificates or records made by a public officer in the course of his official duties. (*People* v. *Reese,* 258 N. Y. 89.) A like exception had been recognized by the Federal courts, in which courts the requirement of confrontation is based on a provision found in article VI of the Amendments to the Constitution of the United States. (See *Heike* v. *United States,* 192 F. 83, affd. 227 U. S. 131.)

Wigmore, in his work on Evidence (3d ed. § 1398, p. 141), refers to the exceptions to the rule of confrontation as follows:

'' It follows equally that the constitutional provision does not exclude evidence admissible by way of *exception to the Hearsay rule.*

'' The use of *dying declaratiⱅns* has been often thus passed upon, and without any dissenting rulings.

'' A like consequence must of course follow for the other exceptions to the Hearsay rule; it has been expressly sanctioned for *official statements* \* \* \*.''

*Heike* v. *United States* (*supra*) involved the trial of an indictment charging criminal conspiracy in connection with the alleged fraudulent entry through the United States Customs of certain importations of sugar. The decision held that the admission in evidence of certain dock books containing

entries by assistant United States weighers showing their observations of the scales, made at the time of the weighing of the sugar involved, was not a violation of the hearsay rule and might be received in evidence without violating the rule of confrontation, though the records had been made by persons not called as witnesses upon the trial. The basis of the holding was that, being official records of the government, produced from its files, the records were properly received as *prima facie* evidence of what they purported to record.

One of the defendants' contentions herein is that the autopsy report which was received upon this trial was not a public record, in that it was not available to inspection by the public generally. The test in this State appears to be whether the record is made by a public officer in the course of his official duties. (*People* v. *Reese, supra.*) We do not consider that the public character of the autopsy record was materially affected by the fact that only public officers had access thereto. Such report was made and retained in a public office for a public purpose, and was required to be so made and recorded by express statutory provisions.

The authenticity of the autopsy report herein was established by proof that during an autopsy performed on the body of Madylon McGeehan by Dr. Lefkowitz, he had dictated his observations and findings to a stenographer who made notes of his statements and later transcribed them as the report. This was then signed by Dr. Lefkowitz and filed in the office of the Chief Medical Examiner pursuant to statute. (See Administrative Code of the City of New York, § 878-3.0; L. 1937, ch. 929.)

The New York City Charter (ch. 39) provides for the creation of the office of Chief Medical Examiner of the City of New York, and for the appointment of assistant medical examiners, who are to be doctors of medicine and skilled pathologists and microscopists. The duties of the Chief Medical Examiner and his assistants are set forth in detail in chapter 39 of the Administrative Code of the City of New York. Section 878-3.0 of that chapter provides that if, in the opinion of such medical examiner, an autopsy is necessary, the same shall be performed by him and a detailed description of the findings written during the progress of such autopsy and the conclusions drawn therefrom shall be filed in the Medical Examiner's office.

Section 879 of the New York City Charter [1938] and section 879-1.0 of the Administrative Code of the City of New York relate to the keeping of records. Read together, they provide

that it shall be the duty of the Chief Medical Examiner to keep complete records, and that he shall promptly deliver to the appropriate district attorney and, under certain circumstances, the police commissioner copies of the records and autopsies relating to deaths where criminality is indicated, but that "such records shall not be open to public inspection."

The autopsy report in the present case contained a detailed description of conditions found in various parts of the body of Madylon McGeehan. These statements were all recordings of objective or visual observations to some extent based on the technical or professional knowledge or skill of the examiner. Factual observations of this nature were clearly a "record of any act, transaction, occurrence or event" under section 374-a of the Civil Practice Act. (*People* v. *Kohlmeyer*, 284 N. Y. 366.) While the People do not contend that the autopsy report was competent under section 374-a of the Civil Practice Act, claiming instead that it was properly receivable under the common law as a record made by a public officer concerning his official duties, it is material to point out that the matters set forth in the report were not based on statements of others, but consisted of matters observed directly by the official making the report.

One of the defendants' contentions is that the report was prejudicial because it contained reference to a finding of a perforation of the uterus of deceased of which there was no other direct proof. While it is true that there was no direct proof that the uterus had been perforated, there was, however, circumstantial evidence supporting such an occurrence.

The question whether Dr. Nisonoff had punctured the uterus in performing the operation was an issue on the trial, but it was not an essential issue. All parties agreed that peritonitis had been the cause of death. There does not appear to have been any contention by either side that peritonitis would not have developed unless there had been such a perforation. If death had followed a criminal abortion without any such perforation, guilt would be established.

Nor was the autopsy report offered as the sole proof of the fact of death or of the cause thereof. In a prosecution for homicide, the death of the person alleged to have been killed and the fact of killing by the defendant, as alleged, must be established as independent facts; the former by direct proof and the latter beyond a reasonable doubt (Penal Law, § 1041). It might be questionable whether the autopsy report standing alone would have furnished direct proof of death. We need

not pass on that question, for here there was other direct proof of death. Likewise there was other evidence of the fact of killing by the defendants for, independent of the autopsy report, there was proof that the defendants had performed a criminal abortion which had brought about the death of the deceased.

The question as to the extent to which two classes of documentary evidence, i. e., (1) official statements, and (2) documents admissible in a civil case under section 374-a of the Civil Practice Act, may be received in a criminal case without offending against a defendant's right of confrontation is not clearly settled in this State. At least we find no decision wherein our court of last resort has spoken on the subject since 1938, when the right of confrontation was engrafted into the Constitution.

In *People* v. *Bromwich* (200 N. Y. 385), decided in 1911, the defendant was charged with illegal voting. It was held to be a violation of his right of confrontation to receive in evidence a certificate executed by the clerk of a court of a foreign State to prove the People's contention that the defendant had not been naturalized in that court.

In *People* v. *Reese* (*supra*), decided in 1932, the defendant had pleaded guilty to forgery. An information had been filed by the District Attorney pursuant to section 1943 of the Penal Law, charging earlier convictions. Defendant having denied one of the convictions charged against him, finger print records made by prison officials in another State were placed in evidence to prove same. Use of finger print records for this purpose was authorized by section 482-b of the Code of Criminal Procedure. While the court held in that case that the receipt of the finger print records was improper, it did so because they had not been sufficiently authenticated, and for the further reason that the custodian of the foreign records was not shown to be in a position to make the comparison required in order to enable him to furnish an accurate opinion. The court, however, overruled the claim that the right of confrontation would be violated by the use of the foreign certificate. It distinguished the *Bromwich* case (*supra*) by pointing out the difference between a certificate of an affirmative nature and one offered to prove a negative (as had been the certificate in the *Bromwich* case, *supra*). In the course of its opinion in *People* v. *Reese*, the Court of Appeals stated (p. 96): " * * * The rule of confrontation which in this State is purely statutory (Civil Rights Law [Cons. Laws, ch. 6], § 12; Code Crim. Pro. § 8), has never been deemed to require the exclusion of

certificates or records made by a public officer in the course of his official duty (3 Wigmore on Evidence, § 1398, p. 109; *Commonwealth* v. *Slavski,* 245 Mass. 405, 414, 415, 417; *Heike* v. *United States,* 192 Fed. Rep. 83). * * *."

In the recent case of *People* v. *Rubin* (286 N. Y. 56) the trial of which was held in 1940 after the recent constitutional amendment became effective, the contention was raised that the receipt in evidence of certain prison records offered under section 374-a of the Civil Practice Act had violated the right of confrontation. Though the Court of Appeals, in its opinion, made no express reference to this contention, we think that, by inference, it overruled it. Rubin had been convicted of criminally receiving stolen property. The People contended that he had been a close associate of the thief. To prove this, they introduced in evidence certain prison records of mail received by the thief, which purported to show that Rubin had frequently written to the thief while the latter was in prison. This court affirmed the judgment of conviction under section 542 of the Code of Criminal Procedure (260 App. Div. 1000). Upon appeal to the Court of Appeals, though the claim of error based on violation of the right of confrontation was expressly raised, that court reversed the judgment upon two other grounds: (1) that no sufficient foundation had been laid to justify the receipt of the records, in that it was not shown that the person who made the entries had knowledge of the facts set forth therein; and (2) that error had been committed in applying in the case the presumption frequently applied in civil cases, i. e., identity of persons based on identity of name. As a new trial was ordered by the Court of Appeals in the *Rubin* case (*supra*), we deem that if that court had found that the rule of confrontation forbade the use of the documents, it would have so indicated, for then the records would not have been admissible under any circumstances. Thus the conclusion would appear justified that the Court of Appeals did not intend to lay down any broad rule that records otherwise competent under section 374-a of the Civil Practice Act became *ipso facto* incompetent in a criminal case because of the right of confrontation. If we are correct in this conclusion, it would seem clear that other well-recognized exceptions to the rule of confrontation existing in 1938 must be deemed to be still effective.

A leading case on the subject under consideration (which was cited with approval in *People* v. *Reese, supra*) is *Commonwealth* v. *Slavski* (245 Mass. 405). There the question presented was whether the provisions of article 12 of the Declara-

tion of Rights of the State of Massachusetts, requiring that in prosecution for crime " every subject shall have a right * * * to meet the witnesses against him face to face ", were violated by a statute which permitted the receipt in evidence of an analysis by a State chemist showing the alcoholic content of a certain beverage involved in an alleged illegal sale of liquor. The court held that under the rule deducible from decisions authorizing the admission of public records, which formed an exception to the rule of confrontation, the certificate of the analyst was competent. In the course of a comprehensive opinion by Chief Justice RUGG, the court said:

" The right of one charged with crime to be confronted by his accusers was not created and introduced as something new in criminal procedure by this constitutional provision, but an existing part of the law of the land was thereby secured against future change except by the people themselves. The purpose of this constitutional provision was to put beyond the possibility of abolition by legislative action the principle already established as a part of the common law that witnesses should confront the accused. That principle was adopted as a constitutional guarantee, but with the well recognized exceptions which were a part of the principle and essential to its practical vitality. Dying declarations and the reproduction of testimony previously given by a witness now deceased have already been mentioned.

" One of the acknowledged exceptions to the face to face rule of evidence is that public records are competent evidence when of probative value respecting an issuable fact. That is an ancient principle of the common law, recognized at the time of the adoption of the Constitution."

The opinion in the *Slavski* case then proceeded to enumerate a number of earlier cases in which records kept by public officers were held properly admissible, as well as others in which they were held to have been improperly received. In the latter group were two cases wherein it was held that the report of an autopsy by medical examiners giving their opinion as to the cause of death was incompetent. (*Jewett* v. *Boston Elevated Railway*, 219 Mass. 528, and *Commonwealth* v. *Borasky*, 214 Mass. 313.) Examination of these two earlier decisions shows that they are readily distinguishable from the present case, principally because the receipt of the opinion of the medical examiner as to the cause of death, based on his general inquiry, was the matter held incompetent in those cases. Here the opinion of Dr. Lefkowitz as to the cause of

death was not received in evidence. Only the primary facts found by him were admitted.

Again referring to the *Slavski* case, we find that the court's opinion suggested a general rule concerning the use of public records and discussed its application, as follows: " The discussion in many of these decisions relates to the general principles of the law of evidence and the interpretation of statutes. The principle which seems fairly deducible from them is that a record of a primary fact, made by a public officer in the performance of official duty is or may be made by legislation competent *prima facie* evidence as to the existence of that fact, but that records of investigations and inquiries conducted, either voluntarily or pursuant to requirement of law, by public officers concerning causes and effects involving the exercise of judgment and discretion, expressions of opinion, and making conclusions are not admissible in evidence as public records. This principle may not be universally applicable and there may be exceptions, but it appears to be available in general as a practical working rule.

" The determination of the percentage of alcohol in liquor at a specified temperature is the ascertainment of a fact by well recognized scientific processes. Chemical action and measurement in such an analysis do not depend in general upon the quickness of apprehension, retentiveness of memory, temperament, surmises or conjectures, of the individual. The admission in evidence of the record of such a fact made by a public officer pursuant to statutory obligation would be as likely to be accurate as many of the public records which have been held to be admissible. There would seem to be as little likelihood of variation of result in such an analysis between different chemists as in the observation of the weather, enumeration of proprietors, or the notation of the weights on scales by other classes of public officers. * * * " (p. 417).

The courts of other States have likewise held that statutes authorizing receipt in evidence in criminal cases of certificates showing chemical analyses made by public officers did not conflict with constitutional guarantees of the right of confrontation. (*State* v. *Torello*, 103 Conn. 511; *Sokel* v. *People*, 212 Ill. 238; *Bracy* v. *Commonwealth*, 119 Va. 867.)

Although the statutes of this State applicable to the making and filing of autopsy reports did not specifically provide that they were to be competent as evidence in a criminal prosecution, we deem that under the common law they would be so admissible to establish the primary facts stated therein. The

basis of their admissibility would be that they were records made by public officers in the course of their official duties, pursuant to statutory mandate.

An autopsy made by a skilled pathologist in the performance of his official duties showing primary facts found creates little risk of inaccuracy and would seem to be in that class of public records usually deemed admissible as such.

It would seem, therefore, that, insofar as received, the autopsy report did not violate the defendants' rights of confrontation. But even if we assume that the receipt of the report was error, we hold that it was not prejudicial error under all the circumstances in the present case. Accordingly affirmance is warranted.

TOWNLEY, GLENNON and COHN, JJ., concur; UNTERMYER, J., concurs in result.

Judgments unanimously affirmed.