GAIL SCHELBERGER, Respondent, v EASTERN SAVINGS BANK, Appellant.

First Department, April 14, 1983

**APPEARANCES OF COUNSEL**

*William E. Kelly* of counsel (*Manuel H. Quintana* and *Gianni Donati* with him on the brief; *Lane & Mittendorf,* attorneys), for appellant.

*Bernard Meyerson* of counsel (*Edward P. Dean* with him on the brief; *William J. Fitzgerald,* attorney), for respondent.

KASSAL, J.

Defendant appeals from a judgment entered after a jury trial awarding plaintiff the sum of $30,000 as the proceeds of a life insurance policy issued upon the life of decedent, Edward Schelberger. The policy, issued May 1, 1978, contained a standard clause pursuant to section 155 of the Insurance Law, which excluded coverage upon the death of the insured as a result of suicide within two years from the date of issuance of the policy.

The undisputed proof disclosed that the insured died on December 25, 1979, one year and seven months after issuance of the policy, as the result of an overdose of a barbiturate, Tuinal. The insurer refused to honor the claim and defended the action in reliance upon its assertion as an affirmative defense, that the insured had committed suicide and, accordingly, there was no coverage under the policy. The jury, after full and adequate instruction on the applicable law, consistent with the Pattern Jury Instructions, found in favor of plaintiff, concluding that the insurer did not sustain its burden of proof on its affirmative defense.

■ ■ We disagree with our dissenting colleagues, who, in resolving the issues before us on this appeal, would depart from established law in this State dealing with the application of the presumption against suicide in actions to recover the face amount of a life insurance policy. The dissent, in suggesting that a verdict should have been directed in favor of the insurer since "[t]here was no evidence that the death was accidental", misperceives the underlying nature and strength of the presumption and improperly shifts the burden of proof on the defense of suicide to the beneficiary which, under applicable law, must be established by the insurer, by clear and convincing evidence. On this record, we also find that the summation by plaintiff's attorney does not constitute reversible error so as to warrant a reversal and remand for a new trial.

■ In finding that the weight of the evidence does not support the verdict, the dissent ignores the leading authorities in this State, in the Court of Appeals, in this and in other departments, all of which have uniformly held that

the sufficiency of the proof adduced by an insurer bearing upon its defense of suicide in opposing an action to recover the face amount of a life insurance policy, poses a factual issue for the jury. Although the cases have sustained a directed verdict in favor of the beneficiary upon a finding that the proof offered by the insurer was insufficient to overcome the presumption against suicide, absent supporting proof of an eyewitness or an unequivocal suicide note, we have not been cited to any case holding the presumption to have been overcome so as to remove the issue from the jury's consideration.* Overlooked by the dissent is that it is for the jury to assess the evidence in relation to the presumption against suicide. The proof adduced here was found by the triers of the fact to be insufficient to rebut the presumption. We find no reason to interfere with that factual determination.

### PRESUMPTION AGAINST SUICIDE

The presumption against suicide, one of the strongest presumptions in the law, has been held to require a jury to find accident where the evidence is evenly balanced, both in cases to recover the face amount on a life insurance policy, where the beneficiary has relatively no burden to sustain, and in cases where recovery is sought for double indemnity benefits or under an accident insurance policy, where the ultimate burden of proof is on the beneficiary (*Wellisch v John Hancock Mut. Life Ins. Co.*, 293 NY 178; *Begley v Prudential Ins. Co. of Amer.*, 1 NY2d 530).

*Wellisch* (*supra*), an action brought on a life insurance policy, is a case which closely parallels the facts here. The insurer defended upon the ground of suicide within two years from the issuance of the policy. There, the insured was found in a comatose condition in his automobile, which had left a dry roadway and crashed into a tree. The

---

* Prior to *Wellisch v John Hancock Mut. Life Ins. Co.* (293 NY 178) and *Begley v Prudential Ins. Co. of Amer.* (1 NY2d 530) it had been held that the presumption disappears from the case upon the submission of sufficient countervailing proof by the insurer to rebut it (see *Steinmann v Metropolitan Life Ins. Co.*, 257 App Div 656; *Bass v Equitable Life Assur. Soc.*, 19 NYS2d 736). The Court of Appeals abandoned this application of the presumption in *Wellisch* and *Begley,* holding that the presumption against suicide does not disappear from the case, but "continues to the end of the case" *(Begley v Prudential Ins. Co. of Amer.,* 1 NY2d, at p 533) and "is really a rule or guide for the jury in coming to a conclusion on the evidence" (*Wellisch v John Hancock Mut. Life Ins. Co.*, 293 NY, at p 184).

weather was clear. Uncontroverted expert testimony established that the death resulted from barbiturate poisoning from a drug known as Seconal, the court concluding that a large dose of Seconal had been taken, evidenced by the detection of a small amount in the organs after death (293 NY, at p 181). On the day of the occurrence, the insured apparently had in his possession 30 to 32 capsules. Prior to the time he was found, he had come home from work complaining of a headache and was in a nervous and irritable mood. After striking one of his children, a fight broke out, whereupon the aunt of the insured's wife summoned the police. The wife stated that her husband had been having trouble and she wanted him arrested, since she was about to obtain a judgment in an action for a separation. Decedent allegedly told the officers "Well, you won't come back, she won't be bothered with me any more." (293 NY, at p 182.) After gathering his fishing equipment, Wellisch got into his car and drove away. His body was found later by State troopers and next to him, written on a scrap of paper in his handwriting and signed with his name, was the following: "All life is only one dark hour. M.W. The best thing in this hapless strife is the end of life." (293 NY, at p 183.)

In sustaining the verdict for the plaintiff, the court found a factual question presented as to whether the insured had taken the capsules by mistake or with the intention of killing himself. The handwritten note beside the assured's body was found not to constitute an unequivocal threat of self-destruction, in part based upon testimony of the wife that her husband was in the habit of writing "what she called poetry". Insofar as concerns the presumption, the Court of Appeals held that it does not shift the burden of proof or disappear from the case when evidence to the contrary is offered, but rather, the presumption against self-destruction remains in the case and is to be considered by the jury in assessing the evidence: "The 'presumption against suicide' means that when death by violence is shown and an inference must be drawn by the jury as to suicide or not, then the jury should in justice and good conscience draw the inference of accident, not suicide * * * Of course, that does not mean that there should be a

finding against suicide when the circumstances are *wholly inconsistent* with a finding of accident and there is no reasonable hypothesis available except that of suicide * * * It means only that a fair question of fact as to accident or suicide should be answered: 'accident'." (293 NY, at pp 184-185; emphasis added.)

In actions to recover the face amount of a life insurance policy, reliance upon the presumption against suicide, along with proof of death and issuance of the policy, establish plaintiff's prima facie case (*Wellisch v John Hancock Mut. Life Ins. Co., supra; Bolger v Prudential Ins. Co. of Amer.,* 250 App Div 122; *Weidy v Prudential Ins. Co. of Amer.,* 256 App Div 778; *Weil v Globe Ind. Co.,* 179 App Div 166).

Application of the presumption shifts the burden of going forward to the insurer to establish suicide as a defense by "clearly establishing such facts as will exclude any reasonable hypothesis of accidental death." (Vance, Insurance, p 571.) When proof to the contrary is shown by the insurer, however, the presumption does not vanish from the case, but remains and is to be considered by the jury in evaluating all the evidence (*Wellisch v John Hancock Mut. Life Ins. Co., supra; Begley v Prudential Ins. Co. of Amer., supra*).

We do not disagree with the observation by our dissenting colleagues that the presumption against suicide does not take the place of evidence. They overlook, however, that it is more than evidence. It exists as "a rule or guide for the jury in coming to a conclusion on the evidence." (*Wellisch v John Hancock Mut. Life Ins. Co.,* 293 NY, at p 184.) The presumption arises in recognition of the fact that self-destruction "is contrary to the general conduct of mankind" (*Mallory v Travelers' Ins. Co.,* 47 NY 52, 54-55). It is a judicial recognition authorizing a jury "to take heed of the truth drawn from general human experience, that death by suicide is an improbability, that most men cling to life." (*Wellisch v John Hancock Mut. Life Ins. Co.,* 293 NY, at p 184.)

The strength of the presumption is further reflected in *Begley* (1 NY2d 530, *supra*), an action brought to recover the double indemnity (accidental death) benefit on a life

insurance policy. In such a case, the beneficiary must establish death of the insured as resulting from accident, within the coverage of the policy and not directly or indirectly from any other cause. Unlike a life insurance case, the ultimate burden of proof is upon plaintiff beneficiary to establish accidental death. Nevertheless, the Court of Appeals in *Begley* held that, even with respect to accident coverage, where the evidence is evenly balanced, the jury must find accident as opposed to suicide, albeit in such case where the evidence is balanced, it may be said that the plaintiff has not sustained his ultimate burden. The rationale of the holding there is the realization that the strength of the presumption tips the scale to a finding of accident and not suicide as the cause of death. Thus, the Court in *Begley* observed: "When death has resulted from violence, the presumption against suicide does more than shift the burden of proof and upon having done so disappears from the case; *it continues to the end of the case* and if a fair question of fact is presented as to whether death was due to suicide or accident, then the jury should answer accident." (1 NY2d, at p 533; emphasis added.)

In our case, the proof offered by the insurer to establish suicide was far less than that adduced in either *Wellisch* or *Begley* (*supra*). In *Begley,* the decedent, age 29, had suffered for years from rheumatic heart disease, shortness of breath and ankle edema. His body was found on the ground beneath the window of his hospital room. Both sashes of the window were drawn up into the upper half and the screen in the lower half was broken and flapped outward. There was proof that the insured was mentally depressed during the weeks preceding death and the distance separating the body from the wall of the building might have been due to horizontal velocity. In noting that no one had seen the decedent jump, the court found without dispositive effects the language in the report of the medical examiner that the deceased had "jumped or fell". Viewed most favorably, the proof raised no more than an issue of fact and was found by the court not to be so conclusive as to require a jury to return a verdict of suicide.

There are several other reported decisions where convincing circumstantial evidence of suicide was found insuf-

ficient to rebut the presumption. In *Mandi v Metropolitan Life Ins. Co.* (143 Misc 771) death resulted from drowning. The insurer established:

1. That there were no marks of violence on the body of the deceased;

2. That the deceased had previously been committed to Central Islip Asylum for six months;

3. That he had received a request from Bellevue Hospital to be re-examined;

4. That he was not living with his family;

5. That he had made statements prior to his death that he would in no event return to Central Islip; and

6. That he had made certain statements indicating a suicidal intent to the effect that he would no longer be seen alive.

The court there found that although there were prior expressions indicating a suicidal intent, the insured was seen alive three days after the statements were made and accordingly, the evidence by the insurer was insufficient to rebut the presumption and judgment was directed for the plaintiff.

In *Shtevelan v Metropolitan Life Ins. Co.* (162 Misc 835, affd 254 App Div 729) death resulted from a fall from the window of a hospital where decedent had been confined. Two days prior to death the decedent had been operated on for cancer of the large intestine. This evidence was held by us insufficient to rebut the presumption. We concluded that to find that decedent deliberately jumped to his death was mere conjecture, which could be reached only by indulging in "gratuitous assumptions".

In *Weidy v Prudential Ins. Co.* (256 App Div 778, *supra*) the insured's death resulted from drowning. The insurer there showed:

1. That the deceased acted normally until four days prior to death;

2. That the death of close relatives within a short time prior to his death preyed on his mind;

3. That the decedent had become suspicious of his neighbors and had complained that detectives were spying on him;

4. That the deceased had a peculiar stare in his eyes;

5. That the body was found in the water near the Harlem River Bridge, fully clothed, with the exception of a jacket and overcoat which were found on the railing; and

6. The deceased could not have accidentally fallen from the bridge since he was 65″ tall and the railing of the bridge was 44″ high.

We there held that the facts were insufficient as a matter of law to rebut the presumption and directed entry of judgment in favor of plaintiff.

In *McGuire v Travelers Ins. Co.* (166 Misc 215) death resulted from a fall from the window of a hospital in which the decedent had been confined. The insurer established that decedent had been confined in the hospital for two weeks prior to death by reason of the fact that he was suffering from sarcoma, an incurable disease; he did not have long to live; the screen of the window in the hospital from which decedent fell was unfastened from the inside; and the distance of the body from the base of the building eliminated the possibility that he had fallen. Nevertheless, the evidence was held insufficient to rebut the presumption and a verdict was directed for the plaintiff. There were no eyewitnesses as to the manner by which the assured got from his room to where the body was found.

The significance of eyewitness testimony has been observed in several cases (*Shtevelan v Metropolitan Life Ins. Co., supra; Bass v Equitable Life Assur. Soc.,* 19 NYS2d 736). In one case, eyewitness testimony was found sufficient to rebut the presumption against suicide (*Unger v New York Life Ins. Co.,* 210 App Div 80). There, the insurer established that the decedent had directed the elevator operator to raise the car from the floor landing so that he might look for a ring which had fallen. There was proof that the decedent, while on his hands and knees, jumped head first through the 18 inch opening. Decedent, who was insolvent, had a prior telephone conversation on the day of his death wherein he reportedly stated that if the witness

did not call him immediately at his office, it would be "too late". On this basis, the determination for plaintiff was reversed and a new trial was ordered.

In *Benard v Protected Home Circle* (161 App Div 59) the insured met his death from the effects of carbolic acid, administered by his own hand. The insured was a barber, in poor health, having suffered pain at times. His eyesight was poor. On the date of death he had purchased a four-ounce bottle of carbolic acid, which was used by him to sterilize his barber tools. He took the bottle into a saloon, purchased a glass of beer and took both into the bathroom. When he was next seen coming out, he stated he had killed himself. His lips, mouth, throat and stomach were burned by carbolic acid. The bottle of acid was found on his person, one-third emptied, together with a letter addressed to his wife, asking her to forgive him and to take care of the children. Reversing the direction of a verdict for the insurer, the Appellate Division, Fourth Department, found that the circumstances of death could as easily be reconciled with mistake, citing by way of illustration, the frequent use of the acid in the insured's business and his habit of carrying his physician's remedies in bottles similar to that which contained the acid. Accordingly, the case was remanded for a new trial.

The law in the field has remained consistent for over 90 years. Thus, in *Washburn v National Acc. Soc.* (57 Hun 585), the insured, 21 years of age, was found dead, with a bullet through the back of his head, the bullet having entered the skull one and one-half inches to the rear of the right ear and having passed through the brain on a course inclined upward and forward. The insured's right hand was lying by his right side unclenched and between his legs, was a .32 caliber revolver with one chamber empty. The bullet found in the assured's head corresponded to the caliber of the revolver. There was no evidence of a struggle and the assured had valuable possessions on his person. These served to negate an inference of murder. There was also an indication of burned hair on the back of the head to evidence that the revolver was placed close to the skull when fired. There were no marks of singeing of the hair by gun powder or otherwise. The insurer contended that the

location of the wound and the attitude of the body indicated suicide. The trial court's direction of a verdict for the insurer was found to be error, the court concluding that different inferences could be drawn from the evidence submitted.

The foregoing cases (and there are others) evidence the strength of the presumption against suicide as possibly one of the strongest presumptions in the law. One commentator has observed that it is "practically impossible for the insurer in a double indemnity case to prove a suicide death except through the evidence supplied by an eye witness or by an authenticated suicide note." (Fagan, Insurance, 32 NYU L Rev 1409, 1410.)

An insurer defending an action to recover the face amount of a life insurance policy will encounter even greater difficulty since the beneficiary's burden is far less. All that must be shown to establish plaintiff's prima facie case is the death of the assured and the issuance of the policy, in full force and effect at the time of death. The presumption against suicide aids plaintiff in establishing his case and, despite the contrary suggestion by the dissent here, may and should be properly considered by the jury in assessing the proof.

The proof to overcome the presumption in our case was far less sufficient than that adduced in the foregoing cases. Here, the totality of the proof offered by the insurer was:

1. The insured had ingested somewhere between 30 and 40 pills and that, from the nature of the drug, the opinion was offered that all of the pills were taken at once. In this respect, the case is similar to *Wellisch* (*supra*), where the insured may have ingested over 30 pills of a much stronger barbiturate, Seconal;

2. There is no proof of financial hardship or of any debilitating physical condition;

3. The fact that death occurred on Christmas Day, is not legally dispositive except for the emotional appeal to a jury. The extended emphasis by the defense as to the insured having been left alone on Christmas Day is somewhat nullified by the neighbor's testimony that during the evening of December 24, she saw the deceased in front

of his house and he appeared friendly and happy, talking to another neighbor;

4. That the insured previously had a fight or argument with his wife no more indicates suicide than did the fight in *Wellisch,* which likewise impelled a call to the police. *Wellisch,* taking into account the statement by the assured when he left the house, together with the "poetry" found beside him in the car, is a much stronger case for suicide;

5. There was no proof of any adverse business conditions or reversals, but, in fact, just the opposite;

6. The fact that the telephone cord had been allegedly ripped from the wall does not evidence that the insured intentionally took his own life, particularly considering that plaintiff testified that the phone had been ripped from the wall previously, during the fight she had with the assured;

7. Also to be considered is the proof that decedent was a drug user and, some months prior to his death, had been hospitalized for an overdose of Tuinal of somewhere between 4 and 40 pills. At that time, the decedent admitted taking Tuinal frequently for months, which he used to get high. Dr. Baden conceded that a chronic drug user could build a tolerance to a drug.

█ Moreover, the emphasis placed by appellant and the reliance by the dissent on the conclusion set forth in the report of the medical examiner, which opined that death resulted from suicide, is of no avail since the opinion expressed in the autopsy as to the cause of death is inadmissible as hearsay (*Welz v Commercial Travelers Mut. Acc. Assn. of Amer.,* 266 App Div 668; *Bothner v Keegan,* 275 App Div 470; *People v Nisonoff,* 267 App Div 356, affd 293 NY 597; *Goldschmidt v Mutual Life Ins. Co. of N. Y.,* 102 NY 486; *Louis v Connecticut Mut. Life Ins. Co.,* 58 App Div 137, affd 172 NY 659).

The position urged by the dissent is also in conflict with the prevailing rule in this State which long ago rejected any distinction between accidental means and accidental results (*Mansbacher v Prudential Ins. Co. of Amer.,* 273 NY 140; *Burr v Commercial Travelers Mut. Acc. Assn. of Amer.,* 295 NY 294; *Morgan v Indemnity Ins. Co. of North*

*Amer.,* 302 NY 435; *Miller v Continental Ins. Co.,* 40 NY2d 675). In *Miller,* an action was brought to recover on a group policy which insured against death or bodily injury caused by accident, but excluded death from, *inter alia,* "[i]ntentionally self-inflicted injuries, suicide or any attempt thereat" (40 NY2d, at p 676). The insured, a habitual drug user, met his death through a self-administered overdose of heroin. Rejecting the insurer's claim that there was no liability since death resulted from an intentional, self-inflicted injury, the court held the accident coverage to pertain "not only to an unintentional or unexpected event which, if it occurs, will foreseeably bring on death, but equally to an intentional or expected event which unintentionally or unexpectedly has that result" (40 NY2d, at p 678). Instructive here is the observation of Judge FUCHS-BERG, writing for the unanimous court in *Miller* (40 NY2d, at p 677): "Thus, in the case before us, while it may be inferred that the decedent's introduction of heroin into his body was intentional, there is no proof whatsoever that he intended it to have fatal consequences or even that he was aware of the fact that the particular dose of heroin which he was taking at the time posed any threat of death at all."

■ On balance, other than proof as to the ingestion of a large quantity of drugs, there is no evidence here that the insured intended to take his own life. Taking into account the overwhelming number of cases that have considered the degree of proof necessary to rebut the presumption, we fail to perceive the underlying basis for the speculation by the dissent that the weight of the evidence does not support the finding by the jury on a factual issue which is peculiarly within the jury's province to determine.

The decisions in this State have consistently recognized that the issue of accident or suicide is for the jury to determine, after evaluating the proof offered by the insurer to rebut the strong presumption against suicide. As observed, in an action brought to recover life insurance proceeds, plaintiff's prima facie case is established by proof of the issuance of the policy, the death of the insured and proof to show that the policy was in force and effect at the time of the insured's death. Upon such proof, the insured may rely upon the presumption against suicide which, in

all cases, remains in the case to be considered by the jury in assessing the sufficiency of the proof of self-destruction offered by the insurer. The burden of proof on the issue of suicide is on the insurer. The submission of proof bearing upon the defense creates a factual issue; and it is exclusively within the province of the jury to assess the evidence offered by the insurer in relation to the strong presumption against suicide and to determine, in accordance with appropriate instructions, whether death was by accident or suicide. In such a case, where a plaintiff has a relatively minimal burden in terms of the proof to be offered, weight of the evidence does not apply.

### CONDUCT OF COUNSEL

■ We also find that the closing statements by plaintiff's counsel, although disturbing, were not so prejudicial as to require reversal and remand for a new trial. The statements were not objected to. Moreover, a curative instruction was immediately given, without any exception thereto by defendant.

The challenged portion of the summation by plaintiff's attorney appeared toward the end of the closing statement as follows: "Something else just came to my mind. We are here talking about a policy of thirty thousand dollars and there has been absolutely no evidence to my way of thinking presented to substantiate what the law requires, to wit, an intent to take your own life. John Belushi, he just died from an overdose and by God, shooting heroin and shooting cocaine and taking the pills the booze and going through the ritual he went through the week or so before, he finally O.D.'d. Nobody questioned paying him and that is a million and a half dollar policy but this little Gail Schelberger. If they lose this case what do they lose? They lose the same thirty thousand dollars that they would have had to pay her in the first place so you know what's happened for two years — They are pulling eighteen percent on her thirty thousand and she has a roof that leaks and a boiler that is broken. That is what you have got here. What do we care if we lose the case, that isn't her position. I think that's about it."

Clearly, the statement was improper and had no place in counsel's summation. However, there was no objection by

defense counsel. Instead, both attorneys, at defendant's request, approached the Bench, whereupon, after a discussion which is not contained in the record, the Trial Judge instructed the jury: "The Court was approached by counsel concerning certain points that were said during summation. I want to strongly advise the jury which I will also mention in my charge but I want to say right now that any statement made by either attorney in his summation, any facts that they claim came up during this trial that they may have mentioned, during their summations, clearly are not in any way facts in this case. There are a number of alleged facts stated by both counsel which may or may not have been facts in this case, may or may not have even come out during the testimony, during this trial, but it really must not matter to you in any event because the law is very clear that in deciding the facts it is solely your determination, it is solely your province to determine those facts and you can only find the facts as you find them to be from the evidence in this trial which mainly, not mainly exclusively, solely come from the witness stand or from exhibits admitted into evidence. Not at all from any statement made by counsel in this case. With that admonition the Court is now going to charge the jury on the law of this case."

Defense counsel did not except to the instruction given and raised no formal objection to the improper summation. Apparently, as far as appears on this record, both parties were in agreement that the court properly rectified the matter. Having failed to raise the issue at trial, appellant may not properly assert a claim of prejudice for the first time on appeal.

The other "inflammatory" remarks alluded to by the dissent, but not relied upon by the insurer on this appeal, have no bearing at all upon the issues before us. While we agree that the comments should not have been made and may in part have resulted from the lack of experience of counsel, they were made out of the presence of the jury, after a lunch recess, solely in conjunction with argument on an application to exclude the children from the courtroom in the event they were to be present during the future course of the trial. It is patently clear that there was no

prejudice, since the jurors could not possibly have been influenced by that which they had not heard.

Accordingly, the judgment, Supreme Court, Bronx County (KAHN, J.), entered May 5, 1982, upon a jury verdict in favor of plaintiff, should be affirmed, with costs.

SILVERMAN, J. (dissenting). We would reverse the judgment appealed from and dismiss the complaint. If we were not dismissing, we would at least order a new trial because of plaintiff's trial counsel's inflammatory and prejudicial remarks.

Decedent died as a result of ingestion of a large quantity of a drug called Tuinal, a barbiturate. The issue is whether decedent's death was a suicide or an accident. The death certificate, signed by the medical examiner, gave the cause of death as "[a]cute barbiturate (secobarbital and amobarbital) poisoning. Suicide." This was done pursuant to the medical examiner's duty to make a classification on the death certificate whether the cause of death was natural causes, accident, suicide, homicide, or undetermined.

The autopsy revealed a heavy concentration of barbiturates in the brain; so heavy was the concentration that it could only have been achieved by taking a large number of pills, probably about 60 100 milligram pills, but possibly some number between 30 and 90. Indeed the decedent may have taken more as the autopsy revealed a quantity of barbiturates in his stomach which had not yet been absorbed at the time of death. Further, the pills must have been taken in rapid succession. If taken one at a time, the medical examiner testified, he would have been asleep long before he could have taken any such quantity. The medical examiner gave as his opinion that such a high number of pills could not have been taken inadvertently; it had to be purposeful and intentional. The medical examiner gave this as his opinion beyond a 99% degree of certainty. He said that the recommended dosage of Tuinal for sleeping purposes is one or two 100 milligram capsules; that even drug users are knowledgable that 30 or 60 pills are beyond what is taken to get high; 10 or 20 such pills would constitute a lethal dose for most people; the concentration of barbiturates in decedent's brain was such that everybody would die at that level. The evidence of suicide from

the physical facts of the rapid ingestion of the large quantity of pills was reinforced by the fact that the decedent had a violent quarrel with his wife who had taken the children and gone off to her mother's on Christmas Eve; the death occurred early in the morning of Christmas Day.

There was no evidence that the death was accidental. The jury's verdict could only have rested on the presumption against suicide. But as the Court of Appeals has observed: "That presumption is not one of those that takes the place of evidence so as to create a question of fact even when all the real proof is the other way." (*Wellisch v John Hancock Mut. Life Ins. Co.,* 293 NY 178, 184.)

Further, plaintiff's trial counsel deliberately made inflammatory and prejudicial remarks, which may have influenced the verdict. Some of these remarks were objected to; others were not. They were so prejudicial and inflammatory that we should not let a verdict which may have been influenced by such conduct stand. Plaintiff's counsel indicated his intentions as to such conduct at the very beginning of the trial. On the first day of the trial, in response to defendant's motion to exclude plaintiff's children from the courtroom during the trial, plaintiff's attorney said that the children "will be here in all their glory, * * * they will be here in their pretty little pinafores and everything I can do to prejudice the jury I will do it."

During plaintiff's attorney's opening statement he said:

"Gail Schelberger isn't on trial here * * * Don't punish her because he [defendant or defendant's attorney] wants to save thirty thousand crummy dollars and beat her and her three kids out of it. * * *.

"[T]hey owe Gail Schelberger thirty thousand dollars plus interest for three years and they have been robbing her out of it since then."

In summation, plaintiff's counsel said: "John Belushi, he just died from an overdose and by God, shooting heroin and shooting cocaine and taking the pills the booze and going through the ritual he went through the week or so before, he finally O.D.'d. Nobody questioned paying him and that is a million and a half dollar policy but this little Gail Schelberger. If they lose this case what do they lose? They

lose the same thirty thousand dollars that they would have had to pay her in the first place so you know what's happened for two years — They are pulling eighteen percent on her thirty thousand and she has a roof that leaks and a boiler that is broken."

Carro and Fein, JJ., concur with Kassal, J.; Kupferman, J. P., and Silverman, J., dissent in an opinion by Silverman, J.

Judgment, Supreme Court, Bronx County, entered on May 5, 1982, affirmed. Respondent shall recover of appellant $75 costs and disbursements of this appeal.