SARAH SHTEVELAN, Plaintiff, *v.* METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

City Court of New York, Trial Term, Bronx County, April 27, 1937.

*Zachary M. Delman*, for the plaintiff.

*Charles B. La Voe*, for the defendant.

DONNELLY, J. The action is upon a policy of insurance issued by defendant on the life of Elia Shtevelan in the sum of $2,000 payable to plaintiff. Annexed to said policy and as a supplementary contract thereto, and for the additional consideration of the payment by said Elia Shtevelan of the semi-annual premium, defendant agreed to pay to the beneficiary named in said policy, this plaintiff, the additional sum of $2,000 upon receipt of due proof of the death of the insured as the result, directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means, provided that death shall not have been the result of self-destruction, while sane or insane.

Payment of the additional $2,000 is resisted by defendant upon the ground, as pleaded in its answer, that the death of the insured

was the result of self-destruction. The evidence adduced by defendant to sustain its defense of suicide was wholly insufficient. Insufficient evidence is, in the eye of the law, no evidence. (*Pollock* v. *Pollock*, 71 N. Y. 137, 153; *Laidlaw* v. *Sage*, 158 id. 73, 94, 95.) In the latter two cases the court quoted with approval the language of MAULE, J.: " When we say that there is no evidence to go to a jury, we do not mean that there is literally none, but that there is none which ought reasonably to satisfy a jury, that the fact sought to be proved is established." (*Jewell* v. *Parr*, 13 C. B. 909, 916.)

The burden was upon plaintiff to show that the death of the insured was caused entirely by accidental means, and upon the defendant to show that the insured committed suicide. (*Ostrander* v. *Travelers Ins. Co.*, 265 N. Y. 467.) " Plaintiff's case was duly established *prima facie*, supported by the well-established presumption that where the cause of death was either accident or suicide, and there is no evidence explaining the cause, the law presumes that the death was accidental." (*Weil* v. *Globe Indemnity Co.*, 179 App. Div. 166.) In *Bolger* v. *Prudential Ins. Co.* (250 App. Div. 122) the proof established that the insured died from carbon monoxide poisoning, and defendant conceded that a death from such a cause was due to violent and external means. Defendant disavowed a desire to go to the jury or to submit to the jury the question whether or not under such a state of proof the death was accidental, insisting that the question was one of law and that plaintiff was obligated to adduce the circumstances of death rather than rest on the presumption against suicide, which, the defendant declared, was non-existent. The court said: " The plaintiff's *prima facie* case was aided by the inference of accident arising from the conceded death by violent and external means, which inference arises as a consequence of the presumption against suicide. [Citing cases.] The plaintiff's case being *prima facie* sufficient, the duty rested upon the defendant to go forward with evidence of circumstances surrounding the death from which the defendant wished to have drawn the inference of suicide [citing cases], even though the burden upon the whole case rested upon the plaintiff to establish that the death was due to violent, external and accidental means. (*Whitlatch* v. *Fidelity & Casualty Co.*, 149 N. Y. 45.) "

At the time of his death on August 22, 1936, the insured was forty-three years of age; he was married; he was six feet, one inch in height. Two days before his death he was operated upon for cancer of the large intestine. Within a few minutes after he was last seen alive in his bed in ward 10-a of Fordham Hospital, he

was found at a point about forty feet below ward 10-a which is on the fourth floor of the hospital; he had a fracture of the spinal column and a crushed spinal cord. Plaintiff's evidence that the insured died as the result of these injuries was not disputed.

There are about forty beds in ward 10-a, which is approximately sixty feet by forty feet. There are windows in the room, each of which is fifty-one inches wide; each of the windows opens from the bottom. Outside of and next to each window is a full-length screen, which may be fastened at the top and bottom by what was described as a hook and eye arrangement. Three photos were offered in evidence by defendant and marked, respectively, defendant's Exhibits 1, 2 and 3. Defendant's Exhibit 1 shows ward 10-a with three rows of beds, two on either side of the room, the other in the center. Defendant's Exhibit 2 is a close-up of one of the windows in ward 10-a and of a bed occupied by some one not identified. This photo shows the head of the bed near the window and to the right of it. Defendant's Exhibit 3 is a close-up of a window in the room, the window partly open from the bottom. Dr. Miner testified that the windows in ward 10-a " are right next to the beds of the patients." This is true, so far as the beds on the two sides of the room and at the top of the center of the room are concerned. (Defendant's Exhibit 1.)

No eyewitness of the manner in which the insured met his death was produced. That he deliberately jumped to his death is mere conjecture. It is not enough to show that the insured had an incurable disease. There is no evidence that he knew he had cancer. If it were shown that he did know it, that of itself does not justify the conclusion that he committed suicide. There is no evidence that he had determined to end his suffering by self-destruction. In fact, there is nothing in the record from which there may be gleaned any impression of his state of mind upon any subject. The conclusion that the insured deliberately jumped to his death may be reached only by indulging in a series of gratuitous assumptions; that he designedly sent the nurse out of the room so that there would be no interference with his purpose; that the window next to his bed was closed and that he opened it; and that the screen was secured and he unfastened it.

Dr. Miner testified that " most of the windows " in ward 10-a " were open from the bottom." He testified that he went into ward 10-a after he had examined the body of the insured; he did not then examine any of the windows in that ward; he did not particularly notice them. As to the window alongside of the bed of the insured, Dr. Miner was silent, and as to that window, defendant's counsel insisted there was no evidence to show it was the

one through which the insured fell. Miss Mackay could not say whether the window next to the bed of the insured was open or closed as she left the ward to get for him the glass of water he had requested. She testified that, "in the early part of the evening" of the day on which the insured died, she closed the window. When the insured asked her for the glass of water, it was between nine forty-five and ten P. M. There is no testimony that Miss Mackay was constantly in the room between the early part of the evening and ten P. M. She also testified that when she returned with the glass of water, the bed of the insured was empty; the window was open, and the screen was swinging clear from the bottom.

In front of each of the windows is a radiator, the top of which is near the ledge of the window. The ledge or sill is thirty inches above the floor level. A man of the stature of the insured, standing, on a warm night near an open window might, in his weakened condition, topple against the screen, and, if the screen were not properly fastened, fall through to the ground below. Such a fall could, in the circumstances supposed, occur without breaking a hole through the screen. The impact of the falling body against the unlatched screen would be sufficient to cause it to swing outward. The screen was swinging outward when Miss Mackay returned to the room and found the insured missing from his bed. When, as at bar, death by violent, external means is established, *prima facie* proof is thereby made of the fact that the injuries were accidental, without direct or positive proof on that point, as the law will not presume that the injuries were intentionally self-inflicted. (*Goldfeder* v. *Metropolitan Life Ins. Co.*, 155 Misc. 744.) Plaintiff, aided by the presumption against suicide, was not obliged to prove that the insured did not commit suicide, unless defendant sufficiently rebutted the presumption. (*Fink* v. *New York Life Ins. Co.*, 158 Misc. 441.) At bar, the links in the chain of circumstances adduced by defendant in support of its defense of suicide are fatally weak. Inference must be added to inference. It is a mere guess that the insured had a sinister motive in sending the nurse from the room. It is simply speculation that when the nurse closed the window next to the bed of the insured in the early part of the evening, the window remained closed until he arose from his bed and that he then opened it. And, while it may be true that an unfastened screen is no more conducive to a freer flow of fresh air than if the screen were secured, it is still a mere supposition that, granting the screen to be secured, the insured unhooked it. On this record, and in the absence of any evidence showing that the insured had a motive for suicide, the circum-

stances surrounding his death are as consistent with an accident as they are with self-destruction. And this statement is in no way induced by the assertion in plaintiff's Exhibit 2 ("Proofs of Death") that the insured "fell from window," which, it is conceded, is a mere self-serving declaration. In any event, the *prima facie* case established by plaintiff was not overcome. For that reason, and on the authorities cited *supra*, plaintiff is entitled to judgment in the sum of $2,000, with interest thereon from the 22d of August, 1936. Exception to defendant. Ten days' stay and thirty days to make and serve case.