[848 NYS2d 109]

LISA C. GREEN, Appellant, v WILLIAM PENN LIFE INSURANCE COMPANY OF NEW YORK, Respondent.

First Department, December 20, 2007

## APPEARANCES OF COUNSEL

*Thomas Torto*, New York City, and *S. Edmund Resciniti*, Roslyn Heights, for appellant.

*Bleakley Platt & Schmidt, LLP*, White Plains (*Robert D. Meade* of counsel), for respondent.

## OPINION OF THE COURT

SAXE, J.

On this appeal, we are provided the opportunity to revisit the ancient common-law evidentiary presumption against death by suicide, as it is applied in New York, particularly as it relates to appellate review of a trial court's finding of suicide.

The facts are as follows. On February 20, 2002, at approximately 6:30 P.M., plaintiff Lisa Green found her husband, Alan Green, who was then 54 years old, lying in their bed when she arrived home from work. The bed was made and he was on top of the covers with a copy of the New York Times, his Palm Pilot and his portfolio lying next to him. Finding him unresponsive, plaintiff called 911, and Emergency Medical Service technicians then arrived and determined that Mr. Green was already dead. Members of the police department and the Office of the Chief Medical Examiner conducted an initial investigation for about six hours. Plaintiff's mother, her sister-in-law and Mr. Green's cousin and attorney, Richard Wolff, also came to the apartment.

An empty glass and two bottles of water were found on the nightstand next to the bed; in the top drawer of the nightstand were an empty bottle of hydrocodone pills and an empty bottle of Ambien pills. The hydrocodone bottle had contained 40 pills on January 23, 2002, when Mr. Green filled a prescription following hernia surgery, and the Ambien bottle had contained 30 pills when his prescription was refilled on February 6, 2002. In addition, 61 Vicodin pills out of 100 prescribed to Mr. Green on June 7, 2000 were found in the drawer. An empty vial of Percocet was also found, from a 1997 prescription for plaintiff.

Plaintiff would not permit an autopsy to be performed on Mr. Green, following her mother's upset reaction and Mr. Wolff's agreement, explaining that she and her husband were Jewish and "we don't do that." Plaintiff also objected to a toxicological examination for religious reasons, seeing no difference between it and an autopsy.

After a funeral service, Mr. Green's body was cremated, notwithstanding Jewish law against the procedure. Plaintiff

explained that it was Mr. Green's desire to have his ashes spread over Yankee Stadium, and that her "husband's wishes were more important than anything."

After Mr. Green's death, plaintiff requested that defendant insurance company pay her the death benefit arising out of a life insurance policy it had issued to Mr. Green on December 3, 2001, in the amount of $500,000, designating plaintiff as beneficiary. Defendant refused to pay, on the ground that Mr. Green's death resulted from a suicide and the policy contained a clause limiting its obligation to repayment of the paid premiums in the event the insured committed suicide within two years of issuance of the policy. Plaintiff therefore commenced this action seeking to recover under the policy. In its answer, defendant asserted as an affirmative defense that the death of the insured was the result of suicide.

After a nonjury trial, the court concluded that there was "no reasonable explanation in this case other than suicide," and dismissed the complaint. This appeal ensued.

We hold, contrary to the trial court, that the evidence failed to overcome the powerful presumption embedded in our common law against suicide.

In this state, the nature and application of the presumption against suicide have evolved over time. Because the presumption is based on the premise that "[s]uicide 'is contrary to the general conduct of mankind' " and "an improbability [in] that most men cling to life" (*Wellisch v John Hancock Mut. Life Ins. Co.*, 293 NY 178, 184 [1944], quoting *Mallory v Travelers' Ins. Co.*, 47 NY 52, 54-55 [1871]), treatises have observed that it is not a true presumption, which involves assuming one fact based upon proof of another fact (Black's Law Dictionary 1203 [7th ed 1999]), but "rather, it is a metaphorical way of stating that the burden of proof is on the party alleging suicide" (2 Fishman, Jones on Evidence § 10:5, at 215 [7th ed]). In fact, the *Wellisch* Court characterized it as a different sort of presumption, one that "is really a rule or guide for the jury in coming to a conclusion on the evidence" (293 NY at 184).

There is no unanimity among common-law jurisdictions as to the degree of the burden placed on the party seeking to establish that a death was by suicide; some jurisdictions have imposed a preponderance of the evidence standard, others require more (*see* 2 Fishman, Jones on Evidence § 10:5, at 215-216 [7th ed]). But the standard now applied in this state, as established in *Wellisch*, creates an exceedingly high burden. As was clearly

explained in the case of *Schelberger v Eastern Sav. Bank* (93 AD2d 188, 192 [1983], *affd* 60 NY2d 506 [1983]), "[a]pplication of the presumption shifts the burden of going forward to the insurer to establish suicide as a defense by 'clearly establishing such facts *as will exclude any reasonable hypothesis of accidental death*' " (quoting Vance, Handbook on the Law of Insurance, at 571 [3d ed] [emphasis added]). In other words, due to the presumption, a finding of suicide is warranted only if "no conclusion other than suicide may reasonably be drawn" (*Schelberger v Eastern Sav. Bank*, 60 NY2d at 510).

On the record before us, the trial court was wrong in concluding that there was no reasonable explanation in this case other than suicide. Based upon the evidence before the court, it was also possible to reasonably infer other causes for his death, including the possibility that Mr. Green accidentally overdosed on the pain or sleep medication he had been prescribed following his hernia surgery. But our difference of opinion regarding which inference is the more likely one is not determinative. The analysis we must employ on appeal does not turn on the relative merits of the competing inferences as to whether Mr. Green's death was caused by suicide, accident or other means. Reasonable people may differ as to whether the evidence better supports one hypothesis or the other. Our obligation here is to review the evidence and determine whether the trial court properly concluded that suicide was the *only* conclusion that could reasonably be drawn from the evidence. As a matter of law, it was not. Therefore, application of the law regarding the presumption against suicide necessitated a directed verdict in this case, and we cannot uphold the determination of the trial court as factfinder that Mr. Green committed suicide.

We do not disagree that there was sufficient evidence to logically support the inference of suicide. However, there was much evidence that supports other conclusions as to what caused his death. We are not making findings contrary to those of the trial court as to what occurred; rather, we are simply observing that there are other reasonable conclusions that may be drawn from the evidence, aside from suicide, and that therefore, as a matter of law, the presumption against suicide was not overcome.

Plaintiff testified that February 20, 2002 began as an ordinary day for the couple. Mr. Green, who exhibited no signs of depression or other unusual behavior, told his wife that he would be going to the gym that morning to relieve abdominal pain from his hernia surgery, and that he had to make telephone calls,

including a work-related conference call, that afternoon. Indeed, he was dressed in gym clothes—jeans, t-shirt and sweatshirt, with his sneakers on the floor next to the bed—when he was found that evening.

In addition, Mr. Green's cousin, Richard Wolff, who represented Mr. Green in litigation with his former employer, testified that he spoke with Mr. Green on the morning of February 20, 2002, and they scheduled a meeting for the following week. According to Mr. Wolff, Mr. Green was upbeat, positive and excited about the consulting business he had begun.

Mr. Green had visited his internist the day before his death, and according to the physician's testimony, expressed feelings of depression and anxiety and described problems with insomnia. However, importantly, when the physician asked him directly if he felt depressed enough to take his own life, Mr. Green protested that "he would never do such a thing, he was not suicidal, he was just down." Furthermore, Mr. Green went to the trouble of following his internist's suggestion and telephoning the psychiatrist he recommended, leaving a message on his voicemail.

Moreover, his actions shortly before his death and the circumstances at the time of his death support the inference that his death was accidental. His lying on top of the covers of his bed with a copy of the New York Times, his Palm Pilot and his portfolio surrounding him, like the conversations he had that day and the appointments he made, point to a man engaged in life, not one determined to depart it.

The trial court heavily emphasized the hearsay statements contained in the police report and medical examiner's report, in both of which it was reported that plaintiff remarked that Mr. Green was feeling depressed and had overdosed on pain medication. The court similarly pointed to the testimony of Mr. Green's sister, reporting that on the day after his death plaintiff said that Mr. Green had been depressed and that his death might be attributable to an overdose. Based upon these reports, the trial court held plaintiff's testimony to be incredible to the extent she denied that Mr. Green was really depressed or under substantial pressure and asserted that she did not know what had caused his death, that it might have been a heart attack, or an aneurysm, or an adverse reaction to medication.

The dissent highlights the finding regarding plaintiff's credibility, treating it as highly supportive of the verdict. However, we view that determination as having limited importance. What-

ever plaintiff feared or believed on the day she found her deceased husband regarding the cause of his death, that fear or belief is *not* evidence of how he died. In any event, it would be appropriate to question plaintiff's credibility even in the absence of contradictory statements, given her pecuniary interest in the matter.

The trial court asserted that the amount of medication taken by Mr. Green on the day he died was "inconsistent with an accident and only consistent with the fact that it was a deliberate suicidal act." This assertion is based upon conjecture, and not sufficiently supported by the record. We simply do not know how many pills remained in the Ambien vial by that date. Mr. Green's average usage during the previous prescription may be relevant, but it cannot be relied upon by itself to establish as a fact his usage during the weeks preceding his death. Notably, plaintiff said that Mr. Green took the Ambien regularly and that if he woke in the middle of the night, he took another pill or half a pill. She also admitted to having used approximately five of the Ambien pills herself. The described usage could have left the vial empty or nearly empty on the date in question, without enough Ambien to cause death. As to the painkiller hydrocodone, there is no basis *at all* for a conclusion that *any* of it remained in its vial on that date, given that it was prescribed 27 days earlier and was to be taken at the rate of two every four hours.

The court's remarks regarding the psychology of acute reactive depression and the possibility of it leading abruptly to suicide, although interesting and perhaps apt, like its conclusions regarding the number of pills available to Mr. Green on that date, do not negate the availability of other reasonable conclusions besides suicide to be drawn from the evidence here.

The evidence that Mr. Green was experiencing physical, emotional and financial difficulties, following his recent career change and very recent surgery, could certainly support an inference that he committed suicide, *but fails to compel it*. That the trial court found it "quite clear" that Mr. Green was depressed does not suffice.

Nor does plaintiff's refusal to permit a toxicology exam or an autopsy on religious grounds, notwithstanding her compliance with the insured's wish to be cremated, compel the conclusion that the death was a suicide.

The open questions posed by the dissent, such as why plaintiff would have remarked on the lack of pills and suggested the pos-

sibility of suicide immediately after her husband's death, and what else could have caused his death, need not be answered to properly rule on this appeal. In the face of the applicable presumption against suicide, we need only determine whether the court correctly concluded that suicide was the *only* reasonable conclusion to be drawn. However, we observe that a woman whose husband just died might, in a panic, draw conclusions that she may later be dissuaded from by calmer thinking, and that middle-aged men may also die of accidental overdoses as well as from other sudden fatal breakdowns of bodily functions. While an autopsy would have helped answer those questions, the family's wishes against the procedure do not serve to eliminate those other possibilities.

In many other cases, equally strong bases were presented for an inference of intentional suicide, yet the presumption could not be overcome. In *Schelberger* (93 AD2d at 197-198), the insured had ingested 30 to 40 Tuinal pills (a barbiturate), the death occurred on Christmas Day, the insured had recently had an argument with his wife, the telephone cord had been allegedly ripped from the wall, and the decedent was a known drug user who had previously been hospitalized for an overdose of Tuinal upon ingesting somewhere between 4 and 40 pills. This Court observed that "other than proof as to the ingestion of a large quantity of drugs, there is no evidence here that the insured intended to take his own life" (*id.* at 199). This Court therefore concluded that the presumption against suicide required upholding a jury verdict in favor of the insurance beneficiary (*id.*), and the Court of Appeals observed that there was "no basis in law for disturbing [the] verdict" (60 NY2d at 512).

In *Wellisch*, the insured was found comatose in his car which had crashed into a tree despite dry and clear weather conditions, and his death a few days later was determined to be the result of barbiturate poisoning from the drug Seconal, which he had picked up from a pharmacy for his aunt on the day of the crash, and which he was known to have taken in the past for headaches (293 NY at 181). The evidence in *Wellisch* also established that earlier that day the insured had complained of a headache, was in a nervous and irritable mood, had slapped one of his children, causing the child to fall, break a glass and cut himself, and had experienced some discord between himself and his wife, prompting his aunt to call the police. In fact, when the police arrived, the insured had remarked, " '[w]ell, . . . she won't be bothered with me any more' " (*id.* at 182). He then

went out with his fishing gear, and crashed on the way to his favorite fishing place. In addition, a scrap of paper was found in the car upon which the insured had written, " '[a]ll life is only one dark hour . . . The best thing in this hapless strife is the end of life,' " which the insurance company viewed as a suicide note, while the wife viewed it as poetry (*id.* at 183). The Court observed that while "[i]t was conclusively shown that Morris Wellisch died from an overdose of seconal[,] . . . a question was presented as to whether he took the extra capsules by mistake or with the intention of killing himself," finding the proof circumstantial and equivocal (*id.* at 184). It particularly noted that "[t]here was an innocent reason for the possession and use of the drug, in some quantity" (*id.*). Accordingly, in reliance on the application of the presumption, the Court upheld a finding against the insurance company (*id.*).

We recognize that in the foregoing cases, the appellate courts were upholding findings rather than reversing them. However, it is important to recognize that this was because they were applying the presumption, not simply deferring to the factfinders' conclusions. Here, even giving appropriate deference to the trial court's findings, and recognizing its advantage of having seen the witnesses—a limited advantage when related to plaintiff, since, as indicated, we would in any case question her credibility based upon her pecuniary interest in the outcome—we must come to an opposite conclusion. This Court has not only the authority but the responsibility to review the evidence to determine whether the judgment is warranted by the established facts (*see Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983]). Because the evidence supplies a logical basis for alternative reasonable conclusions, such as the possibility that Mr. Green took an overdose of his medications by mistake, not with the intention of killing himself, the evidence failed as a matter of law to overcome the presumption against suicide.

If the standard of review was merely whether a fair interpretation of the evidence in the record supported the inference drawn by the trial court, our analysis would change. However, the strong presumption against a finding of suicide unless that is the only conclusion that may reasonably be drawn changes the applicable analysis, and requires a reversal here. The record fails to support the court's ultimate finding that the only available reasonable inference is that Mr. Green committed suicide. Therefore, the presumption against suicide required, as a matter of law, a result in favor of plaintiff.

Accordingly, the judgment of the Supreme Court, New York County (Harold Beeler, J.), entered June 29, 2006, dismissing the complaint after a nonjury trial, should be reversed, on the law, without costs, and plaintiff awarded the principal amount of $500,000, plus statutory interest from the date of the insured's death. The Clerk is directed to enter judgment accordingly.

ANDRIAS, J.P. (dissenting). Taking into consideration the strong presumption against suicide, I nevertheless respectfully dissent and, based upon the facts as found by the trial court, which are not refuted in any way by plaintiff, find that it was not unreasonable for the court to infer that Alan Green committed suicide. Accordingly, I would affirm the court's decision and judgment in favor of defendant insurer dismissing the complaint.

It is undisputed that, at about 6:30 in the evening of February 20, 2002, plaintiff returned home from work to find her 54-year-old husband Alan Green lying dead on their bed. Mr. Green was insured under a life insurance policy issued by defendant. He had applied for the $500,000 policy on September 18, 2001 and the policy was issued on December 3, 2001. The policy provided for a limited death benefit of the return of the premiums if the insured died as a result of suicide within two years of the date of issue. After her husband's death, plaintiff requested payment as the primary beneficiary under the policy and, upon defendant's refusal to pay the full amount of the policy on the ground that her husband's death resulted from a suicide committed within two years of the issuance of the policy, this action ensued.

After hearing the evidence, the trial court (Harold Beeler, J.), sitting without a jury, made the following findings of fact: Mr. Green had voluntarily resigned his employment in August 2001 and had formed a new venture to provide information technology consulting services; however, between the time he resigned and the time of his death six months later, Mr. Green had not earned any income from this new venture. While he was unemployed, Mr. Green had borrowed $30,000 from plaintiff in order to meet his child support obligations from an earlier marriage, and in September 2001, a month after he resigned, Mr. Green was unable to pay the initial $318.50 premium on his new life insurance policy, which amount was paid by plaintiff. Mr. Green was also subject to a restrictive covenant preventing him from soliciting his former employer's customers for two

years and had commenced litigation to challenge the enforceability of such covenant; that suit was still pending at the time of his death.

On the night of her husband's death, plaintiff told a police officer that her husband had been "depressed and overdosed on pain medication." Plaintiff also told a representative of the Office of the Chief Medical Examiner that her husband had been depressed and unemployed. Plaintiff, despite being informed by a deputy medical examiner that, in the absence of proof of the cause of death, she might have difficulty with any later insurance claim, refused to permit an autopsy or toxicological examination to be conducted, claiming that it violated Jewish law. Nevertheless, although Jewish law prohibits cremation, plaintiff allowed her husband to be cremated. According to plaintiff's trial testimony, her husband told her before they were married that he wanted to be cremated and have his ashes scattered at Yankee Stadium.

The day before he died, Mr. Green had an appointment with his personal physician and told the doctor that he was "depressed," out of work, and "feeling under lots of pressure." He also reported sleeping poorly, being depressed and anxious, and having insomnia. He also told the doctor "words to the effect that he didn't see the point of being alive," which the doctor's notes interpreted as Mr. Green having "suicidal thoughts, but . . . not [being] suicidal." The doctor found that "Mr. Green had a reactive depression" and referred him to a psychiatrist. Mr. Green was unable to reach the psychiatrist by phone that day and left a message for the psychiatrist to return his call. No suicide note was found after his death and there was no previous history of mental illness and no known previous suicide attempts.

Mr. Green had filled a prescription for 40 hydrocodone pills for pain following hernia surgery in January and the prescription vial for the hydrocodone, as well as the vial for 30 Ambien pills that had been dispensed on February 6, 2002, was found empty after his death. On the evening of his death, plaintiff spoke to her husband's physician and, during the course of their conversation, indicated that "pills were missing," which the doctor interpreted as expressing an indication that Mr. Green may have committed suicide by taking the pills. Plaintiff also told her sister-in-law the next day that pills were involved in her husband's death and that her husband had been depressed as a result of financial problems. She also was wor-

ried and expressed her desire to her sister-in-law that one of her husband's friends, who was also his dentist, not be told anything about the pills.

The court found that the fact that an individual had been depressed in the immediate period before death is an important factor in determining whether the death was the result of suicide. It further found that many suicides can be the result of acute depressions that result from personal financial problems of a few days' duration; that Mr. Green was suffering from depression at the time of his death and many people commit suicide without a plan as the result of acute reactive depression; that suicide notes are found in only approximately 25% of cases where suicide is later determined to have been the cause of death; that a toxicological examination would have established whether Mr. Green's death was the result of an overdose of medication; and that an autopsy would have established the cause of death even more definitively than a toxicological examination and would have determined whether Mr. Green's death was a result of an overdose of medication or the result of some other medical condition or natural cause. Such examinations, the court stated, would have determined whether or not there was medication in Mr. Green's body and the amount, if any, that was there.

Finally, the court found that the ingestion of 10 10-milligram Ambien pills or the ingestion of 100 milligrams of hydrocodone was sufficient to cause death, and that Mr. Green's medical records did not establish that he was suffering from any other condition which would have caused him to die.

Based upon the foregoing, the court made the following conclusions of law: that, based upon evidence proving her husband's death and that the life insurance policy was in effect at the time of death, plaintiff had made out a prima facie case entitling her to recover on the policy; that the burden then shifted to defendant to prove that Mr. Green committed suicide; that the standard to be applied by the trier of fact, in this case the court sitting without a jury, is set forth in PJI 4:57; and that such standard, which reasons that there is a presumption against suicide since self-destruction is contrary to the general conduct of mankind, was approved by the Court of Appeals as a statement of the prevailing law in *Schelberger v Eastern Sav. Bank* (60 NY2d 506 [1983], *affg* 93 AD2d 188 [1983]).

There is no question that "[t]he presumption against suicide [is] one of the strongest presumptions in the law" (*Schelberger*,

93 AD2d at 190). Such presumption against self-destruction does not disappear from the case upon the submission of sufficient countervailing proof by the insurer to rebut it, but "continues to the end of the case" (*Begley v Prudential Ins. Co. of Am.*, 1 NY2d 530, 533 [1956]), and "is really a rule or guide for the jury in coming to a conclusion on the evidence" (*Wellisch v John Hancock Mut. Life Ins. Co.*, 293 NY 178, 184 [1944]).

If the evidence supporting a finding of accidental or natural death and the evidence supporting a finding of suicide weigh so evenly that the trier of fact is unable to say that there is a preponderance on either side, then the finding must be that the death was accidental or natural. The trier of fact may make a finding of suicide only if it is satisfied from the evidence, and taking into consideration the presumption against suicide, that no conclusion other than suicide may reasonably be drawn (*Schelberger*, 60 NY2d at 509; PJI 4:57).

As noted by the trial court, while it is true that, in many of the cases, including *Schelberger* and *Wellisch*, cited by plaintiff and heavily relied upon by the majority, the jury found that the defendant insurer had not overcome the presumption against suicide, the issue before all the appellate courts, with few exceptions, was whether or not there should have been a directed verdict for the defendant or a holding that the finding of the jury that there was no suicide was against the weight of the evidence. Here, however, we are reviewing a finding by the trier of fact that defendant had overcome the presumption against suicide.

Plaintiff now asks us to examine the trial record de novo and claims that we may reject credibility determinations where they lack a sound and substantial basis in the record, quoting questionable dicta in *Hunts Point Term. Produce Coop. Assn., Inc. v New York City Economic Dev. Corp.* (36 AD3d 234, 244 [2006], *lv denied* 8 NY3d 827 [2007]). The majority seems to adopt the first part of that dubious standard and to ignore the latter. It states that the analysis we must employ on appeal does not turn on the relative merits of the competing inferences as to whether Mr. Green's death was caused by suicide, accident or other means, but that "[o]ur obligation here is to review the evidence and determine whether the trial court properly concluded that suicide was the *only* conclusion that could reasonably be drawn from the evidence."

It is well settled, however, that the fact-finding of a trial court should not be disturbed unless its conclusions could not have

been reached under any fair interpretation of the evidence, particularly where its determination rests, in whole or in part, upon the credibility of the witnesses (*see Thoreson v Penthouse Intl.*, 80 NY2d 490, 495 [1992]; *Bragdon v Bragdon*, 23 AD3d 203 [2005]). Where, as here, there has been a bench trial, while this Court "may render the judgment it finds warranted by the facts, taking into account in a close case 'the fact that the trial judge had the advantage of seeing the witnesses' " (*Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983], quoting *York Mtge. Corp. v Clotar Constr. Corp.*, 254 NY 128, 134 [1930]), only where "no fair interpretation of the evidence" supports them are a trial court's findings not entitled to any deference (*Matter of Jamie R. v Consilvio*, 17 AD3d 52, 59 [2005], quoting *Matter of Allen v Black*, 275 AD2d 207, 209 [2000]).

In making its determination as to whether the defendant had sustained its burden of proving that Mr. Green's death was a result of suicide, there is no question that the trial court considered the presumption against suicide and all of the evidence in concluding that the only reasonable inference to be drawn was suicide. The court also stated that it was, of course, taking into account the critical factor of the credibility of witnesses.

Nevertheless, without elaboration, the majority concludes that "the evidence supplies a logical basis for alternative reasonable conclusions, such as the possibility that Mr. Green took an overdose of his medications by mistake." At another point, the majority asserts in conclusory fashion that the trial court was wrong in concluding that there was no reasonable explanation in this case other than suicide. "Based upon the evidence before the court," it states, "it was also possible to reasonably infer other causes for his death, including the possibility that Mr. Green accidentally overdosed on the pain or sleep medication he had been prescribed following his hernia surgery." Such statement, however, is entirely speculative and factually unsupported. As to Mr. Green's demeanor prior to his death, the majority, although relying for the most part on plaintiff's trial testimony, which the trial court discounted as unreliable, nevertheless finds the trial court's determination that such testimony was incredible as having "limited importance" because, "[i]n any event, it would be appropriate to question plaintiff's credibility even in the absence of contradictory statements, given her pecuniary interest in the matter." It also incorrectly

discounts plaintiff's statements to the police and the medical examiner as hearsay and would leave open the possibility that, rather than dying of a drug overdose, Mr. Green's death resulted from some other cause, natural or otherwise. It finds the trial court's finding that the amount of medication taken by Mr. Green was "inconsistent with an accident and only consistent with the fact that it was a deliberate suicidal act" based upon "conjecture" and paints a scenario that concludes, contrary to the trial court's finding of fact to the contrary, that there was not enough Ambien ("[t]he described usage could have left the [Ambien] vial empty or nearly empty on the date in question") or hydrocodone ("there is no basis *at all* for a conclusion that *any* of it remained in its vial on that date") in the apartment to cause death. If such analysis were accepted as logical, however, the obvious question would be: Why did plaintiff make statements on several occasions shortly after her husband's death that "pills were missing" or that pills were involved in her husband's death? Moreover, if there was no Ambien or hydrocodone in the apartment, as the majority opines, what caused Mr. Green's death?

Initially, the majority overlooks the fact that the trial court specifically found that based upon its review of the evidence as stated in the findings of fact, "in many ways Mrs. Green, the plaintiff, was not credible in her trial testimony." It particularly found that Mrs. Green's trial testimony that her husband was not really depressed or under real pressure before his death was just not credible. The court also found that plaintiff's statements to third parties almost immediately or very soon after her husband's death, before time for any real reflection, indicated that, contrary to her trial testimony, she, in fact, believed that her husband may well have intentionally overdosed on medication.

While plaintiff is not a doctor, the court found that she had lived with her husband and was aware of his condition. That, coupled with the fact that she had told the police very soon after her husband's death that he had "been depressed and overdosed on pain medication"; that she told the medical examiner's representatives that her husband had been depressed and unemployed; and that she told her husband's doctor the very night of her husband's death that pills were missing and were in some fashion involved in his death, as well as her statements to her sister-in-law to the same effect the next day, indicated to the court that plaintiff believed that her husband

was, in fact, depressed and that his death may well have resulted from a deliberate overdose of medication.

The court also found that plaintiff's position regarding an autopsy and toxicological examination vis-à-vis the cremation "was simply not reasonable or credible." It found it very hard to understand how plaintiff would object to a simple toxicological examination, which would have shed a huge amount of light concerning the cause of her husband's death, and at the same time agree to have her husband cremated. Finally, the court found that plaintiff was not aware that her husband had ever experienced an adverse reaction to either hydrocodone or Ambien, and, aside from a recent non-life-threatening hernia operation, Mr. Green was in very good health at the time of his death. In the court's opinion, it would be pure speculation to conclude that his death was the result of natural causes.

Most importantly, perhaps, the court found that there had been sufficient pills available in the apartment to cause his death, which pills were later found to be missing. Based upon a prior prescription for 30 Ambien pills that had lasted 60 days, and finding that there was no reason to believe that the 30 pills prescribed on February 6 would have lasted a longer or shorter time than the same amount of pills prescribed two months earlier, the court found that a substantial amount of Ambien was available 14 days after the prescription was refilled. The amount of pills that would have been ingested by Mr. Green as reflected by the absence of Ambien in any of the vials, as well as the possibility that some of the hydrocodone pills previously prescribed were taken, led the court to conclude that there was sufficient to have caused Mr. Green's death. In the court's opinion, this was not the type of situation where it could be regarded as an accidental overdose. It found that Mr. Green was not a drug addict who had previously overdosed on drugs, as was the case in *Schelberger,* and that the amount of medication was inconsistent with an accident and only consistent with the fact that it was a deliberate suicidal act.

The majority's hypothesis of an accidental overdose might be plausible if the evidence were otherwise and there were some pills left in the prescription vials after Mr. Green's death. While the trial court did not specifically quantify the number of pills that were presumably missing, it found that there had been sufficient pills available in the apartment to cause death. Such inference was based upon the fact that 30 Ambien pills had been prescribed 14 days earlier on February 6 and 40 hydroc-

odone pills had been prescribed 27 days earlier on January 23. Based upon Mr. Green's past history, which the court specifically considered, even if Mr. Green had taken one Ambien pill per day, a dosage twice as much as was reflected in his earlier prescription for 30 pills having lasted 60 days, there still would have been approximately 16 pills left in the vial at the time of his death. The same can be said of the 40 hydrocodone pills, although there was no prior history to gauge the actual usage.

Thus, if one, two, three, four, five, or even 10 pills had been left in either vial, a plausible argument could be made that Mr. Green may have accidentally or mistakenly taken too much of either Ambien or hydrocodone or a combination of both. However, there were no pills left in either vial and it was up to the trial court, as the trier of fact, to draw the appropriate inferences. The majority does not and, indeed, cannot point to anything in the record or in the court's well reasoned and thoroughly detailed decision that, applying the controlling standard of review, would warrant a finding that the trial court's credibility finding and the inference of suicide it drew could not have been reached under any fair interpretation of the evidence (*see Thoreson*, 80 NY2d at 495).

The majority also places great emphasis upon the "presumption against suicide." As explained by the Court of Appeals, however, such "presumption is not one of those that takes the place of evidence so as to create a question of fact even when all the real proof is the other way," and when there is much in a case, such as this, to suggest suicide, but there are also circumstances that point the other way, "it [is] the jury's business to resolve the doubt" (*Wellisch*, 293 NY at 184, 185; *see also Broun v Equitable Life Assur. Socy. of U. S.*, 69 NY2d 675, 676 [1986] ["Where, as here, there is a reasonable hypothesis of accidental death, however unlikely, it is the jury's business to resolve the doubt. The jury [in this case the trial court's] verdict cannot, therefore, be set aside for want of sufficient evidence" (citations omitted)]).

Plaintiff argues that since the trial court found that her testimony was not credible, it would have had to infer that the opposite is true, i.e., that Mr. Green took an overdose of pills with the intention of taking his own life. Such an inference, plaintiff claims, is based upon the type of speculation that has been held insufficient as a matter of law to satisfy the defendant's burden of rebutting the presumption against suicide (citing *Shtevelan v Metropolitan Life Ins. Co.,* 162 Misc 835, 838,

839, [1937], *affd* 254 App Div 729 [1938] [insurer's defense of suicide was nothing more than "mere guess" and "speculation" which was wholly insufficient to establish that the decedent deliberately intended "self-destruction"]). However, unlike *Shtevelan,* where there were no eyewitnesses to a patient's fall from a hospital window two days after being operated on for cancer of the large intestine, and there was no evidence that the patient knew that he had cancer and nothing in the record from which there might be gleaned any impression of his state of mind upon any subject (*id.* at 836-837), here defendant presented credible evidence that Mr. Green was depressed as a result of financial and other pressures at the time of his death.

Moreover, as the trial court found, the trouble with plaintiff's position is that she argues that there is no proof presented by the defendant to show the cause of her husband's death sufficient to overcome a presumption against suicide while, at the same time, she prevented the type of examination, even a simple type of toxicological examination, that would have shed light on how her husband died. It also found that what plaintiff did reflected an inconsistent position with respect to her belief as to Jewish law concerning autopsy, toxicological examination and cremation. While the court could understand that, on the night of her husband's death, plaintiff may have been upset and did not want to allow an invasion of her husband's body, on later reflection, after speaking to the deputy medical examiner and her husband's cousin, who had also acted as his lawyer from time to time, and being advised of the insurance consequences that might follow from her failure to allow such examinations, her actions reflected a much more studied, deliberate decision. As the court stated, "she didn't really want to find out because she was afraid that her husband, in fact, did commit suicide."

The trial evidence, while circumstantial in many respects, established that Mr. Green was under financial pressure after being unemployed for six months; that he evidenced symptoms of depression and told his doctor the day before his death that he did not see the point of being alive, or words to that effect; and that a quantity of prescription painkillers and sleeping pills sufficient to cause death was found to be missing after his death. Given such evidence, it cannot be said that the trial court's conclusion that Mr. Green committed suicide could not have been reached under any fair interpretation of the evidence.

Finally, while not disagreeing that there was sufficient evidence to logically support the inference of suicide, the majority

would hold that the law regarding the presumption against suicide necessitates a directed verdict in this case. However, as previously noted, this Court may direct a verdict only where "no fair interpretation of the evidence" supports the trial court's finding.

Carried to its logical conclusion, the majority's holding would impose a requirement of proof beyond a reasonable doubt rather than a preponderance of the evidence, including circumstantial evidence and all reasonable inferences to be drawn therefrom (whether in a jury or a nonjury trial), in order to support a trier of fact's finding of suicide rather than accident.

McGuire and Malone, JJ., concur with Saxe, J.; Andrias, J.P., and Nardelli, J., dissent in a separate opinion by Andrias, J.P.

Judgment, Supreme Court, New York County, entered June 29, 2006, reversed, on the law, without costs, and plaintiff awarded the principal amount of the policy, plus statutory interest from the date of the insured's death. The Clerk is directed to enter judgment accordingly.